**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 13 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SCOTTY L. MOORE,

      Petitioner-Appellant,

v.

DAN REYNOLDS; LARRY FIELDS,

      Respondents-Appellees.

No. 97-6065

---

Appeal from United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-94-963-C)

---

David A. Ruhnke, of Ruhnke & Barrett, Montclair, New Jersey (Scott Braden, Assistant Federal Public Defender, Oklahoma City, Oklahoma, with him on the brief), for the appellant.

William L. Humes, Assistant Attorney General (W.A. Drew Edmondson, Attorney General, and A. Diane Blalock, Assistant Attorney General, with him on the brief), Oklahoma City, Oklahoma, for the appellees.

---

Before **TACHA**, **BRORBY**, and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Petitioner Scotty Lee Moore, an Oklahoma state prisoner sentenced to death, appeals the district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus. We affirm.

I.

Moore was convicted of robbery in 1978 and served three and a half years in state confinement. After his release, he lived with an aunt and uncle in Umbarger, Texas, for a brief time and began a romantic relationship with his cousin, Vicki Caster. In late September or early October 1983, Moore and Caster went to Oklahoma City, and lived there most of October, staying initially with a friend of Moore's and later at the Airline Motel. Moore worked at a pizza restaurant, at a car wash, and as a clerk at the Airline Motel, using the alias "Jerry Whitlock." In late October, a co-worker at the Airline Motel, Alex Fernandez, accused Moore of stealing money from the business, and the owner of the motel authorized Fernandez to fire Moore.

Moore and Caster returned to Texas for a brief period, then drove to Dodge City, Kansas, where they stayed with Debbie McLaughlin, a friend of Caster's, until the middle of November. On November 11, 1983, Caster called June Setzkorn, a friend of hers who lived just outside of Dodge City, to borrow money. At Setzkorn's invitation, Moore and Caster drove to Setzkorn's house and Caster borrowed $50. Caster and Moore purchased beer and whiskey and returned to the Setzkorn home later that same evening as they knew the Setzkorns would be out of town attending a funeral. They broke into the home and

-2-

stole a variety of items, including money, firearms, and ammunition. Moore and Caster also broke into the Setzkorns' adjoining meat processing business and stole additional items, including money, food stamps, and packaged meat. They dropped some of the stolen items off at a friend's house before returning to McLaughlin's house.

Moore and Caster left the next day and arrived in Oklahoma City on November 13, 1983, where they visited a nightclub and Moore tried unsuccessfully to sell some of the stolen firearms. After leaving the nightclub, Moore and Caster purchased some liquor and attempted to rob the Airline Motel, where Alex Fernandez was working the night shift. Although Moore attempted to enter the motel carrying one of the stolen firearms, he was unsuccessful, and the couple fled in their car. Later that evening, Moore called Fernandez to ask if there were any rooms available. Fernandez apparently said "no," which angered Moore.

Moore and Caster spent the next three nights with friends and, on November 16, 1983, they checked into the Swank Motel. On the evening of November 17, 1983, they went to a nightclub and again decided to rob the Airline Motel. As with their first attempt, Moore and Caster knew Fernandez would be working alone. Moore told Caster she was to open the cash register while he tied and gagged Fernandez.

Moore and Caster drove to the Airline Motel and parked behind the motel. As they walked from their car to the office, Moore said to Caster: "Dead people can't talk." Trial Transcript at 528. Caster entered the office first, walked to the counter, and began

-3-

talking to Fernandez. Moore entered behind Caster, carrying a stolen .22 rifle. Moore yelled at Fernandez to look at him, then directed him to come out from behind the counter. Moore instructed Caster how to open the cash register and told her to look in the drawers for "the big money." Id. at 529. He directed Fernandez into the office restroom. As Caster was attempting to wipe away her fingerprints, she heard gunshots. She ran out of the office toward the car, with Moore following her. The couple drove around for a while and then returned to the Swank Motel and loaded their belongings. They stopped initially at a pay phone and called the Airline Motel to see if anyone would answer. There was no answer and they drove to a cafe, ate breakfast, and drove toward Texas.

Caster asked Moore why he had killed Fernandez and Moore replied: "You'd be dead, too, if you had been shot five times in the head." Id. at 531. Moore told her he directed Fernandez to lay face down and not to move and then shot him in the head. Moore said "he couldn't figure out why every time he pulled the trigger there [were] little red balls of fire that come out." Id. at 532. Finally, Moore said "he didn't know it could be so easy to kill someone." Id. at 532-33.

Motel employees discovered Fernandez' body later that morning and called the police. The police found several .22 casings on the floor in the bathroom near Fernandez' body, as well as outside the bathroom in the lobby area. Bloodstain evidence indicated Fernandez had been shot multiple times in the back of the head while lying in the same position on the bathroom floor. There were no signs of a struggle. An autopsy indicated

-4-

Fernandez suffered five gunshot wounds to the head, all fired from approximately the same angle.

Moore and Caster visited the home of Moore's sister and brother-in-law in Big Springs, Texas, on the morning of November 20, 1983. During the visit, Moore gave the .22 rifle he had used to kill Fernandez to his brother-in-law and told him to keep it for Moore's nephew. Moore's brother-in-law agreed, and retained custody of the rifle until it was recovered by the police. According to Caster, Moore told her he needed to get rid of the rifle and he believed it would not be found at his brother-in-law's house.

On November 23, 1983, Moore and Caster were stopped by police in LaMesa, Texas, because their vehicle's headlights were not on. During the stop, Moore told Caster (who was in the driver's seat) he was not going to jail. Moore proceeded to place the car in gear and press on the gas pedal from his position in the passenger seat. He directed Caster to drive, saying "If I have to, I'll take a few of them [the police] with me." Id. at 543. As Caster drove away at a high rate of speed, officers fired shots at the vehicle. The vehicle came to a stop after its front tires were blown out. Caster and Moore were arrested and taken into custody. Caster subsequently agreed to cooperate with authorities.

After a five-day jury trial in Oklahoma state court, Moore was convicted of first degree felony murder on October 19, 1984, and was sentenced to death. On direct appeal, the Oklahoma Court of Criminal Appeals affirmed Moore's conviction and sentence. Moore v. State, 736 P.2d 161 (Okla.Crim.App. 1987). The Court of Criminal Appeals

denied his petition for rehearing and his petition for writ of certiorari was denied by the United States Supreme Court on October 5, 1987. Moore v. Oklahoma, 484 U.S. 873 (1987).

Moore filed an application for post-conviction relief in state court, which was denied on June 9, 1988. On appeal, the Oklahoma Court of Criminal Appeals rejected most of the arguments raised by Moore, but agreed the "especially heinous, atrocious or cruel" aggravating circumstance was invalid. Moore v. State, 809 P.2d 63, 65 (Okla.Crim.App. 1991), cert. denied, 502 U.S. 913 (1991). Specifically, the court noted it had previously limited this aggravating circumstance "to those murders which were preceded by torture or serious physical abuse," and concluded the record in Moore's case was "void of any torture or serious physical abuse suffered by Mr. Fernandez prior to his death." Id. Independently reweighing the aggravating and mitigating circumstances, the court found the evidence at the sentencing phase was sufficient to support the jury's findings on the remaining three aggravating circumstances (i.e., that Moore would constitute a continuing threat to society, that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and that Moore was previously convicted of a felony involving the use or threat of violence to a person). Although the court noted Moore had presented "much evidence in mitigation," it concluded the sentence of death was "factually substantiated and appropriate" in light of the remaining three aggravating circumstances. Id. at 65-66.

On May 21, 1992, Moore and other death row inmates filed a civil action pursuant to 42 U.S.C. § 1983 in Oklahoma federal district court challenging an Oklahoma State Penitentiary policy prohibiting barrier-free or contact visits with counsel, psychologists, and other health professionals. The federal district court held the challenged policy violated plaintiffs' constitutional rights, but determined alterations of the policy unilaterally adopted by penitentiary officials during the litigation were in compliance with constitutional requirements. At the time it entered final judgment, the federal district court dissolved the stays of execution it had entered on behalf of Moore and his fellow plaintiffs. On appeal, this court remanded and directed the district court to enter an order invalidating the modified restrictions on contact visits between plaintiffs and their counsel. Mann v. Reynolds, 46 F.3d 1055, 1064 (10th Cir. 1995). However, this court refused to enter new stays of execution. Id. at 1063.

Following dissolution of the stay of execution in the civil action, Moore's execution was rescheduled for July 12, 1994. This prompted a flurry of activity, including simultaneous efforts at post-conviction relief in state court and in federal district court. The state court denied Moore's second application for post-conviction relief and his application for stay of execution on July 8, 1994, and that denial was affirmed by the Oklahoma Court of Criminal Appeals on December 16, 1994.

Moore's emergency motion to stay execution was denied in federal district court. This court affirmed that denial on July 8, 1994. On July 9, 1994, Moore filed his petition

-7-

for writ of habeas corpus in federal district court, along with a renewed application for stay of execution, and the court granted the stay on July 11, 1994. While his federal habeas action was still pending, Moore filed what amounted to a third application for post-conviction relief in state district court,[1] which was denied. It is unclear from the record before us whether Moore appealed that denial.

## II.

Before we address the issues raised by Moore on appeal, we must determine whether the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) is applicable to this appeal. The AEDPA amended chapter 153 of title 28 of the United States Code governing all habeas proceedings in federal courts, and created a new chapter 154 governing state habeas proceedings filed by prisoners subject to capital sentences. See 110 Stat. 1217-26. Although the new provisions of chapter 154 are expressly applicable "to cases pending on or after [April 24, 1996], the date of enactment of [the AEDPA]," 110 Stat. 1226, a state can take advantage of them only if it satisfies the requirements of 28 U.S.C. § 2261(b) and (c). As for the amendments to chapter 153 (which do not contain an effective date), the Supreme Court has held they are generally not applicable to cases filed before AEDPA's effective date. See Lindh v. Murphy, 117 S.Ct. 2059, 2068 (1997).

---

[1] Moore raised two issues in the application: (1) the trial court lacked subject matter jurisdiction over him; and (2) the State violated his constitutional rights by deliberately using false and misleading testimony and withholding exculpatory evidence.

Because the State of Oklahoma has not yet satisfied, or even argued it can satisfy, the requirements of § 2261(b) and (c), the expedited habeas procedures set forth in chapter 154 are inapplicable to this case. See Nguyen v. Reynolds, 131 F.3d 1340, 1345 (10th Cir. 1997) (reaching similar conclusion in habeas action filed by Oklahoma state prisoner facing capital sentence). Further, because the habeas petition in this case was filed prior to AEDPA's effective date, the amendments to chapter 153 (including the requirement that a habeas petitioner obtain a certificate of appealability) are also inapplicable. See Lindh, 117 S.Ct. at 2068.

Under pre-AEDPA standards, a state habeas petitioner cannot appeal a district court's ruling on a habeas petition unless a district or circuit judge issues a certificate of probable cause (CPC). 28 U.S.C. § 2253. To obtain a CPC, a petitioner must make a "substantial showing of a denial of [a] federal right," Barefoot v. Estelle, 463 U.S. 880, 893 (1983), precisely the same showing a petitioner must make under AEDPA standards to obtain a certificate of appealability (COA). See Lennox v. Evans, 87 F.3d 431, 434 (10th Cir. 1996), cert. denied 117 S. Ct. 746 (1997).

The district court denied Moore a COA. Out of an abundance of caution, we will grant Moore a CPC and review his issues on the merits.

III.

**Ineffective assistance of counsel during guilt/penalty phases of trial**

Moore contends his primary trial counsel, assistant public defender Robert

Whittaker, was ineffective. He asserts Whittaker spent an inadequate amount of time investigating and preparing for both the guilt and penalty phases of trial. He also asserts Whittaker failed to prepare a summation for the penalty phase of trial and, as a result, was forced to waive summation. Moore's claims of ineffective assistance present mixed questions of law and fact, which we review de novo. Duvall v. Reynolds, ___ F.3d ___, 1998 WL 97748 at *4 (10th Cir. 1998).

To prevail on his claims of ineffective assistance of counsel, Moore must satisfy two requirements. First, he must demonstrate his counsel's performance was constitutionally deficient, i.e., it fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 688 (1984). To make this showing, Moore must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance that might be considered sound trial strategy. Strickland, 466 U.S. at 689. Second, he must demonstrate there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997).

*Pretrial preparation/investigation.* In connection with his attack on Whittaker's pretrial investigation and preparation efforts, Moore alleges Whittaker spent fewer than eight hours with him in preparing the case for trial, made no effort to investigate Caster's background, who was the State's primary witness, made only one trip to Texas to

investigate possible mitigating evidence to present at the penalty phase, and did not begin preparing for the penalty phase until one week prior to trial. In addition, Moore complains he was tried, convicted, and sentenced to death within 100 days of his first contact with Whittaker.

Moore failed to raise these allegations either on direct appeal or in his first application for post-conviction relief filed in state court. Instead, they were first raised in his second application for post-conviction relief. The state court summarily rejected these arguments, concluding they were barred on the grounds of res judicata. No evidentiary hearing was conducted on Moore's claims. On appeal, the Court of Criminal Appeals agreed the arguments were barred by res judicata.

Generally, where "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner" can satisfy either the "cause and prejudice" standard, or, alternatively, the "fundamental miscarriage of justice standard." See Coleman v. Thompson, 501 U.S. 722, 750 (1991). For this procedural default doctrine to apply, the state law ground must have been "the exclusive basis for the state court's holding" and "strictly or regularly followed" by the state courts and applied "evenhandedly to all similar claims." Maes v. Thomas, 46 F.3d 979, 985 (10th Cir. 1995).

In Brecheen v. Reynolds, 41 F.3d 1343, 1363-64 (10th Cir. 1994), we recognized

an exception to this general rule and held failure to raise an ineffective assistance of counsel claim in a direct state court appeal will not preclude federal habeas corpus review of the claim despite state law characterizing such a failure as a procedural default. Our conclusion rested on "the interplay of two factors: the need for additional fact-finding, along with the need to permit the petitioner to consult with separate counsel on appeal in order to obtain an objective assessment as to trial counsel's performance." Id. at 1364. In light of these needs, we concluded a state law rule barring review of claims not raised on direct appeal was not an "adequate" basis for barring federal habeas review of ineffective assistance claims because it forced criminal defendants to either raise such claims on direct appeal, with new counsel but without the benefit of additional fact-finding, or to have such claims forfeited under state law. Id.

The question presented here, and not addressed in Brecheen, concerns the legal effect of a state prisoner presenting an ineffective assistance claim for the first time in a second or successive state post-conviction application. As in Brecheen, many of Moore's ineffective assistance arguments were subject to dismissal by the state court on state procedural grounds. Unlike Brecheen, however, there is a more compelling basis for us to conclude many of Moore's ineffective assistance arguments are procedurally barred. Specifically, Moore could have raised those arguments in his first post-conviction application in state court.

Cases from other courts suggest failure to raise an ineffective assistance claim in

the first state collateral proceeding procedurally bars federal habeas review of that claim where the final state court considering the claim rejects it on state procedural grounds. See McCoy v. Norris, 125 F.3d 1186, 1189-92 (8th Cir. 1997) (habeas petitioner's claim of ineffective assistance procedurally barred because not raised in state post-conviction proceeding), cert. denied, 118 S.Ct. 1195 (1998); Hill v. Jones, 81 F.3d 1015, 1024 (11th Cir. 1996) (habeas petitioner's ineffective assistance claim procedurally barred where raised for first time in second state post-conviction proceeding and rejected by state courts on procedural grounds), cert. denied, 117 S.Ct. 967 (1997); see also Lowe-Bey v. Groose, 28 F.3d 816, 818 (8th Cir. 1994) ("The failure to raise the ineffective assistance claims in an appeal from the denial of [post-conviction] relief raises a procedural bar to pursuing those claims in federal court.").

Ultimately, we conclude Moore's failure to raise these ineffective assistance claims until his second application for post-conviction relief precludes federal habeas corpus review of the claims absent a showing of either cause and prejudice or a fundamental miscarriage of justice. As outlined above, the Oklahoma Court of Criminal Appeals concluded Moore's claims were barred on res judicata grounds. Thus, the denial of these claims rested on a state procedural ground independent of the federal question raised by Moore. See Coleman, 501 U.S. at 750. Further, both at the time Moore filed his initial application for post-conviction relief and later when the Court of Criminal Appeals denied his second application for post-conviction relief, it was firmly established

under Oklahoma law that "[a]ny ground . . . not raised" in an "original, supplemental or amended application" for post-conviction relief could not form "the basis for a subsequent application" for post-conviction relief. Okla. Stat. Ann. tit 22, § 1086; see, e.g., Jones v. State, 668 P.2d 1170, 1171 (Okla.Crim.App. 1983) (applying § 1086 to second application for post-conviction relief filed by state prisoner). Unlike the petitioner in Brecheen, Moore failed to take the opportunity in his first application for post-conviction relief to raise his ineffective assistance of trial counsel claims and develop any necessary facts related to those claims. Thus, he "deprived the [Oklahoma] state courts of an opportunity to address those claims in the first instance." Coleman, 501 U.S. at 732. Accordingly, we conclude the state procedural ground relied upon by the Oklahoma Court of Criminal Appeals constituted an "adequate" basis for dismissing Moore's claims. See id. at 750.

After carefully reviewing the record, we further conclude Moore can demonstrate neither cause and prejudice, see Demarest v. Price, 130 F.3d 922, 941 (10th Cir. 1997) (ineffective assistance of counsel in post-conviction proceedings does not constitute "cause" under federal law), nor a fundamental miscarriage of justice, id. (to meet "fundamental miscarriage of justice" standard, petitioner must supplement habeas claim with colorable showing of factual innocence), to bypass the procedural bar caused by his failure to raise these issues in his first application for post-conviction relief.

Even assuming for purposes of argument that Moore could demonstrate either

cause and prejudice or a fundamental miscarriage of justice and thereby provide us with a "gateway" to review claims that Whittaker failed to adequately investigate or prepare, we would find no merit to them. Notably, Moore acknowledges in his opening appellate brief that "he lacks the factual back-up to suggest just what would have been discovered if Mr. Whittaker had conducted any kind of guilt-phase investigation." Opening Brief at 42-43 n.36. Thus, Moore effectively concedes he cannot demonstrate any prejudice arising out of Whittaker's alleged failure to conduct an adequate guilt-phase investigation. As for Whittaker's alleged failure to conduct an adequate penalty-phase investigation, Moore argues Whittaker should have discovered and presented the following mitigating evidence: (1) Moore's long history of drug and alcohol abuse, which had roots in underlying chronic depression, learning disorders, and neurological impairment (Moore does not indicate how Whittaker could have learned of alleged psychological problems without benefit of a mental health expert); (2) Moore's family history of affective disorders, learning disorders, and alcohol and drug dependence; (3) Moore's mother's co-dependence and her accompanying facilitation of Moore's (and his father's) substance abuse; (4) Moore's chronic health problems during childhood; (5) Moore's father's failure to adequately parent Moore; (6) Moore's traumatic experiences in the Texas prison system; and (6) Moore's suicide attempt at age 20. In addition, Moore contends there are numerous witnesses who would have come forward to testify on his behalf if Whittaker had contacted them. Moore does not specifically indicate the

content of these witnesses' testimony.

In deciding whether there is a reasonable probability the mitigating evidence pointed to by Moore would have changed the outcome of the sentencing phase (i.e., persuaded the jury the balance of aggravating and mitigating circumstances did not warrant death), we must keep in mind the mitigating evidence that was actually presented. Five witnesses testified on Moore's behalf: Sandy Osborne, his sister; Robert Hamilton and Dora Hendricks, two friends he met and worked with at a car wash in Oklahoma City; and Dwight and Annie Moore, his father and mother. Osborne recounted Moore's childhood. She described Moore as a happy child through grade school, and testified he became involved with drugs sometime in junior high. Osborne indicated Moore's drug use continued and culminated in the robbery charge. She testified she was very close to Moore, as was their mother; but that Moore and his father did not have a close relationship. Hamilton and Hendricks indicated Moore was a hard worker and was well liked. Moore's father and mother recounted Moore's childhood and life history. In particular, Moore's father testified he worked long hours while Moore was growing up and was unable to spend much time with him. Moore's mother testified she suspected Moore had a drug problem, but never talked to him about it because she did not know how to handle it. Both his father and his mother testified Moore's father had problems with alcohol and was arrested for robbery shortly before Moore murdered Fernandez.

We must also "keep in mind the strength of the government's case and the

-16-

aggravating factors the jury found." Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir. 1994). Although the government's case depended heavily on the testimony of Caster, the overall case against Moore in the guilt-phase of trial was extremely strong. In particular, the evidence unequivocally indicated he was the person who made the decision to steal firearms from the Setzkorns, was the only person who regularly handled the firearms, and was the person who ultimately decided to rob and kill Fernandez. Further, the uncontroverted evidence indicated Fernandez was murdered execution-style, with five gunshots to the back of the head while he was lying passively on the floor of the motel office bathroom. There was also extremely damaging testimony from the state's firearms examiner and from Karl Setzkorn (the owner of the weapon), both of whom testified the murder weapon had a tendency to jam, particularly if pointed in a downward direction. The implication of this testimony was that it was possible (though not certain) that during the process of shooting Fernandez, Moore had to stop and physically clear the weapon before continuing to fire shots into the back of Fernandez' head. Based upon this evidence, as well as evidence admitted during the penalty-phase (e.g., evidence of Moore's robbery conviction, evidence of Moore's use of a firearm during an altercation), the jury found the existence of four aggravating factors: (1) previous conviction of a felony involving the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding a lawful arrest or prosecution; and (4) the existence of a probability that Moore would

-17-

commit criminal acts of violence that would constitute a continuing threat to society.[2]

Although defense counsel did not introduce all of the mitigating evidence now pointed to by Moore, the mitigation witnesses touched on many of the topics to which Moore refers, such as his distant relationship with his father, drug abuse, and his father's substance abuse and criminal problems. We conclude the jury would not have found additional evidence concerning these same topics sufficiently mitigating to change the sentence rendered. See Brewer v. Reynolds, 51 F.3d 1519, 1527 (10th Cir. 1995).

As for evidence of Moore's alleged mental health problems, we seriously question whether Whittaker can be charged with negligence in failing to discover and present such evidence. As outlined in greater detail below, Whittaker filed a motion for funds to hire a mental health expert, but the trial court denied that request. Moore offers no explanation in his habeas petition concerning how Whittaker could have discovered and presented this information without receiving the requested funds. Accordingly, evidence of Moore's alleged mental health problems, and their possible effect on the outcome of the sentencing phase, will be considered separately in our discussion of Moore's argument that he was improperly denied funds for a mental health expert.

*Penalty-phase summation waiver*. During the penalty phase of trial, the prosecution introduced testimony from two witnesses (an acquaintance of Moore's, who

---

[2] The "heinous, atrocious or cruel" aggravating factor was subsequently stricken by the Oklahoma Court of Criminal Appeals in reviewing Moore's first application for post-conviction relief. See Moore, 809 P.2d at 63.

-18-

testified Moore pulled a gun on him, and Moore's ex-wife, who testified Moore came to her house after the murder and stated he would do what he had to do to stay out of trouble, even if it meant leaving a corpse), as well as a stipulation concerning Moore's robbery conviction.  In response, Moore introduced the testimony of five witnesses, whose testimony we have summarized in the preceding section addressing Moore's claim of inadequate pretrial preparation and investigation.  After the prosecutor gave his initial closing argument, Moore's counsel waived closing argument.  The following bench conference then took place:

> MR. MACY [prosecutor]:  There is case law holding that--
> THE COURT:  Just a minute.  Wait until they get here.
> MR. MACY:  There is case law holding in circumstances where the Defendant waives his closing argument, it is within the discretion of the Court as to whether or not to allow the State to give their final closing.  I will respectfully request of the Court to grant permission for me to go ahead and make my final closing.
> MR. RAVITZ [defense counsel]:  Judge, I don't know of any case law that says that, but even if it did, this Court has held--this Court has constantly followed the rule that when a defense lawyer waives--when the Prosecution has shut down, you cannot give him a right to argue.  In fact, the statute, the death penalty statute, is different.  It says the Prosecutor may argue and the Defense may argue.  It doesn't set any type of situation.  But I don't know of any case that does it.  I've never seen it done in the history of this courthouse, to let somebody else argue.  If we are going to start doing it now in this second stage, this Defendant is not going to get a fair trial or a fair hearing.
> MR. MACY:  If his lawyers don't want to argue for him, I can't help that, Your Honor, but I'm entitled to present the State's case.
> THE COURT:  I would like to see the case that you refer to.  This comes as a rather surprise to me.
> MR. MACY:  I don't have it available.  It is there and I know it exists, I have seen it.
> THE COURT:  We'll take a brief recess and go back and make sure

of this.

MR. MACY: Okay.

[A break was taken. Proceedings resumed in chambers.]

THE COURT: If I do allow this, if I do allow it, I think I must determine whether your client is aware of the effect of waiving closing argument. Are we ready to proceed on this? On the record, I think your client needs to be in on this in view of this, Bob. Do you agree?

MR. RAVITZ: In view of what?

THE COURT: This.

MR. RAVITZ: Oh, he's aware of it.

THE COURT: Do you want to waive his presence? I decline to do that. I think it's fundamental.

MR. RAVITZ: Bring him in, that's fine.

[Moore brought into chambers and proceedings resumed.]

THE COURT: All right. Here is Professor Whinery speaking to this, too. You must be advised what your attorney -- attorneys have elected on your behalf and you heard them waive closing argument on your behalf, didn't you?

THE DEFENDANT: Yes, sir.

THE COURT: You must understand the purpose of closing argument. The purpose of closing argument is persuasion. It is not evidence. It contemplates a liberal freedom of speech and the range of discussion, illustration, and argumentation is wide. Counsel for the State and your attorneys in this case have a right to discuss fully from their standpoints the evidence and the inferences and deductions that arise therefrom. Do you understand me so far?

THE DEFENDANT: Yes, sir.

THE COURT: You have an absolute right for your attorneys to argue this case; however, you may waive that right, providing it is done knowingly and intelligently. Do you understand the purpose of closing argument as I have explained it to you?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Do you concur with the decision of your attorneys that you wish to waive closing argument?

THE DEFENDANT: Yes, sir, I do.

THE COURT: You have consulted with your attorneys prior to them announcing in open court that they wish to waive on your behalf closing argument; is that true?

THE DEFENDANT: Yes, sir.

THE COURT: You have had their advice in the matter?

-20-

THE DEFENDANT: Yes, sir, I have been advised on it.

THE COURT: I must advise you further of some of the law involved here. It is true that closing arguments may be waived by the parties if they choose to do so. However, waiving--a waiver of the closing argument by the Defendant does not preclude the prosecuting attorney from making his closing argument. It is within the discretion of the trial Court of whether a closing -- whether a final closing argument may be made by the prosecutor after the Defendant has waived his argument. For the record, I cite the following cases: Harvey Brewer versus State, which is cited 280 P. 473, Oklahoma Criminal 461 P. --- no, that's not the cite.

MR. MACY: Here it is.

THE COURT: 44 Oklahoma Criminal 361; also at 280 P. 473, and Moore versus State, which is cited as 461 P.2d at 1017. Professor Whinery in his Treatise on Manual of Evidence, at Page 161, cites these two cases in support of his statement that the waiver of a closing argument by the Defendant does not preclude the prosecuting attorney from making his final closing argument and that it is within the discretion of the trial Court whether a final closing argument may be made by the prosecutor after the Defendant has waived his argument. In summation of this point, as I view the law on this so far, unless I am persuaded to the contrary, it is up to the trial judge, me in this case, in the exercise of my judicial discretion, of whether I shall permit the State now to make a closing argument after your attorneys have waived argument in your behalf. Now, I ask again, knowing what all I have said here, do you wish to waive your closing argument?

MR. RAVITZ: We want the record to show that unless the Court is ordering us off the case, we are giving this man professional advice, not the Court. We don't believe that that is the law in a capital case that the Court has just stated. We believe that there is a different standard in a capital case, because the statute specifically says the State and the Defendant or his Counsel shall be permitted to present argument for or against the sentence of death, unlike the statute that allows for the State to go first and then last, the death penalty statute is not set up that way. All judges have interpreted that final closing argument -- to give, to rebut the Defendant's closing argument, that's why they have given the State that right, but it is not a right that is given to them under the statutes of the State of Oklahoma. It is different in those two cases that you cite, because this is a capital case. Further we recommend at this particular time, based on the fact that there has been absolutely no preparation made on the closing argument on my advice to Mr. Whittaker. I specifically told Mr. Whittaker that he should not prepare a closing argument and that he should waive it and Mr.

Whittaker could not get up and give a proper closing argument at this particular stage. So, I make a recommendation to you at this particular time to waive that closing argument.

THE COURT: Do you understand what he said?

THE DEFENDANT: Yes, sir.

THE COURT: What is your desire?

THE DEFENDANT: I'll go along with his advice. I'll waive closing arguments.

THE COURT: State have any response on this?

MR. MACY: At this time, the State respectfully requests that -- that is the law of the State of Oklahoma. The fact that some of the judges -- the fact that the attorneys have not seen fit to invoke the law doesn't change the fact that it is the law. And of course again the purpose of the closing argument is to have a full explanation and argument of the issues. It's not to play a game of one-upmanship or trickery or ambush. And of all cases, a death case is one in which the rule should be followed carefully; everyone should have a fully opportunity to present this case to the jury; to make the best search for the truth that they can and to obtain justice, and you don't do that by playing little games; you do it by following the laws of the State and I am entitled to close. It is in your discretion.

THE COURT: Anything further, gentlemen?

MR. RAVITZ: I have several things to say, Your Honor.

THE COURT: Say it.

MR. RAVITZ: First of all, I know of no case in the history of this courthouse where the State has allowed the -- where the judge has allowed the Defendant -- for the State to get up. Specifically, I have never seen it done in a capital case. There has got -- the word is "sound discretion." If this Court felt that Mr. Keel's argument was not up to snuff, if he didn't cover something, I would like to know what the Court would put in the record for that. Secondly, the Court ought to be concerned with the rights of this individual Defendant. I'll tell you flat out if I was Scott Moore, I would attack his counsel for being ineffective if I was handling his appeal, because in this particular instance, he was advised -- he was advised by lawyers who obviously didn't know what they were talking about, who felt that the Court would follow the law. Sound discretion means just that -- sound discretion. There's got to be some basis to do it; some reason to do it. An inexperienced prosecutor getting up and saying a few things in his closing argument and then sitting down, then that could do it; a prosecutor getting up there and saying two things -- I think the guy is guilty beyond a reasonable doubt or I think he deserves the death penalty and sitting down,

that would be proper, but a complete closing argument, there is no basis for it. Obviously, if the Court grants this, the Court is doing one thing; all they are caring about is prejudicing the Defendant to let everything in and get the Defendant; stick the Defendant any way they can. Just -- we think to do this in this particular case in light of what has constantly been done in this courthouse and what has constantly been done in which there was a proper closing argument and it was detailed and whatnot, where the defense counsel have themselves admitted that they are unprepared to make a closing argument, because we felt the court would follow the law. We specifically state that this man's rights are being totally and completely violated if the prosecutor is allowed to make a closing argument, which is just going to be solely to prejudice the jury and that's the whole purpose of that closing argument, because that's the only reason he could give it, because everything has been covered already.

THE COURT: Do you concede that it is within the Court's discretion to allow this?

MR. RAVITZ: No, I have already stated the reason, I think, because of the statutes.

THE COURT: You have several times referred to my, what, "sound discretion"?

MR. RAVITZ: No, the Court has overruled our objection, it is my understanding, based on the fact that I think the death penalty statute clearly does not allow --

THE COURT: Wait a minute. Let me interrupt you. I haven't ruled on anything on this issue yet.

MR. RAVITZ: Oh, okay. I'm sorry. The Court stated --

THE COURT: I'm seeking your advocacy. I ask again, Do you concede that this is within the Court's sound discretion to --

MR. RAVITZ: Absolutely not. I think the death penalty statute is specific; that it says both sides can argue. It doesn't say the State has a right to rebuttal. The Courts have constantly let the State rebut the Defendant's contentions, but there's no right under the statutes in a capital case to do that.

THE COURT: You are overruled. The State is permitted to close.

MR. RAVITZ: While I'm making a further record, the Defendant believes that the Court is making this ruling solely to get the Defendant the death penalty in this case; that the Court has bent over backwards from day one to make sure that this Defendant got the death penalty; that further this Defendant was given ineffective assistance of counsel by virtue of our advice. And we want the record to so state this man's rights under the

-23-

Sixth, Eighth, and Fourteenth Amendments have totally been violated and that the Defendant has received a totally fundamentally unfair trial and this Court's last decision just verifies that out. He won't even state the reason why he is exercising discretion; why he is going to let the prosecutor argue.

THE COURT: You are bordering on contempt of Court.

MR. RAVITZ: That's on the record; that's in the record, too, is it not?

THE COURT: I think I would be justified in citing you, but I decline to do it, because I have known you so long. Let's go and complete this case.

Trial transcript at 1181-91. Based upon the trial court's ruling, the prosecutor proceeded to give a second closing argument. Defense counsel then requested an opportunity to present a closing argument. The trial court denied that request, concluding defendant had waived closing argument.

In his direct appeal, Moore contended the court erred in (1) allowing the prosecution to make a second closing argument after defense had waived closing argument, and (2) in refusing to allow him to revoke his waiver and give a closing argument after the prosecution's second argument. With respect to this second argument, Moore specifically contended the court denied him effective assistance of counsel. The Oklahoma Court of Criminal Appeals rejected Moore's arguments, noting Moore "was represented at trial by one of the most experienced capital defense lawyers in the State. Though he had two attorneys at trial, it was Mr. Ravitz who waived closing arguments, and whose advice appellant told the court he wanted to follow after being informed of his rights." 736 P.2d at 167.

In his first application for post-conviction relief in state court, Moore repeated the

-24-

same arguments. In particular, he argued the trial court erred in allowing the prosecution to make a second closing argument after defense had waived its closing argument, and in refusing to allow Moore's counsel to retract the waiver and give a summation after the prosecution had made its second closing argument. In connection with this argument, Moore also contended trial counsel's decision to waive oral argument in the penalty phase "was [not] based on a reasonable trial strategy . . . and thus denied [Moore] his sixth and fourteenth amendment rights to effective assistance of counsel." Application 1/25/88 at 19-20. However, Moore made no contention that trial counsel's waiver was based on counsel's alleged failure to actually prepare a closing argument. The court summarily rejected Moore's arguments, concluding they previously had been raised and rejected on direct appeal.

In his second application for post-conviction relief in state court, Moore argued, for the first time, that defense counsel was ineffective for failing to prepare and give a closing argument. The state district court summarily rejected these arguments, concluding they were barred on the grounds of res judicata. No evidentiary hearing was conducted on Moore's claims. The Oklahoma Court of Criminal Appeals agreed the claims were barred under the doctrine of res judicata.

In his federal habeas action, Moore continues to argue he was denied effective assistance due to defense counsel's decision to waive closing argument in the penalty phase. Moore also contends this tactical error was the direct result of and compounded by

-25-

Whittaker's alleged failure to prepare a closing argument. In support of this latter contention, Moore has submitted the affidavit of counsel Ravitz, who alleges he learned, immediately prior to the start of the penalty phase, that Whittaker had not prepared a closing penalty phase argument, but instead planned to "work something up over dinner." According to Ravitz, his ultimate decision to waive summation was the direct result of Whittaker's failure to prepare a summation.[3]

The federal district court considered Moore's arguments on the merits, and concluded:

> [T]he defense devised the plan to waive closing argument in order to cut off the State's final closing argument. Considering the strength of the State's evidence and Mr. Ravitz's presumed familiarity with the tactics of the Oklahoma County District Attorney's Office in capital cases, this tactic was professionally reasonable. Mr. Macy, a seasoned district attorney, was to deliver the final summation on behalf of the State. Mr. Ravitz's actions were calculated to prevent this from occurring and were not the conduct of incompetent counsel. Furthermore, the defendant made a knowing waiver of the right to closing argument after lengthy questioning and explanation by the trial court. In fact, the court's prophylactic actions were so thorough as to clearly frustrate Mr. Ravitz in his strategic decision.
>
> Although he asserts in his affidavit that he selected the waiver tactic due to Mr. Whittaker's unpreparedness to deliver a closing, Mr. Ravitz

---

[3] We note this later affidavit by Ravitz contradicts his statements made in court in arguing the prosecution should not be permitted a second argument when the defense had waived closing argument. At that time, Ravitz said, "[T]here has been absolutely no preparation made on the closing argument on my advice to Mr. Whittaker. I specifically told Mr. Whittaker that he should not prepare a closing argument and that he should waive it and Mr. Whittaker could not get up and give a proper closing argument at this particular stage." Trial transcript at 1186-87. It would appear from these statements that the lack of preparation was the direct result of the chosen strategy to waive closing argument, and not the converse.

stated to the trial court that the lack of preparation for the closing argument was due to his advice to Mr. Whittaker; as he stated during the <u>in camera</u> hearing, "defense counsel have admitted that they are unprepared to make a closing argument, because we felt the court would follow the law." The Court's review of Mr. Ravitz's statements made during trial leads to the conclusion that the defense had banked on the trial court disallowing further argument by the State after waiver, and that was in fact the reason no closing remarks were prepared.

In addition, the Court concludes that Mr. Ravitz's conduct and remarks indicate that he believed that the trial court's decision to allow a second state summation would be held to be error on appeal. Mr. Ravitz stated the basis for his belief that the court's interpretation of the law was erroneous in an articulate and vociferous fashion. After he was informed of the trial court's intention to permit further argument by the State, he expressed his disagreement with such zeal that he was almost found in contempt. Moreover, when the proceedings reconvened and the court inquired again if the defense intended to waive, the defense stuck by their tactical decision. These circumstances lead the Court to conclude that defense counsel thought a winning issue had been preserved for appeal, clearly a valid tactic in light of the outcome of the first phase of the trial. As stated, the claim was raised in several guises on direct appeal. The fact that the claims were ultimately unsuccessful does not render trial counsel's reliance on such strategy to be constitutionally deficient.

District Court's Opinion at 18-19. Ultimately, the court found "that the conscious, tactical choice of the defense in waiver of closing argument [wa]s to be accorded deferential scrutiny and that the tactic was not unreasonable." Id. at 21. In addition, the court found "no reasonable probability that, but for the waiver of closing argument, the jury would not have imposed a sentence of death." Id.

Although we can consider Moore's general claim that waiver of closing argument was improper, there is some question whether we should consider the new argument that the waiver was prompted by Whittaker's failure to prepare a closing argument. This new

-27-

argument was not raised until Moore's second application for post-conviction relief, and arguably not until the instant habeas petition. As we concluded in our discussion of Moore's arguments concerning defense counsel's alleged failure to properly investigate and prepare, ineffective assistance claims not raised in the first post-conviction application cannot be raised in a second post-conviction application absent a showing by petitioner of either cause and prejudice or fundamental miscarriage of justice. As regards his ineffective assistance of counsel claim that the waiver of argument was prompted by lack of preparation, Moore can meet neither of these standards.

With respect to Moore's general ineffective assistance of counsel claim concerning waiver of closing argument, he must satisfy the two requirements set forth in Strickland. First, he must demonstrate his counsel's performance was constitutionally deficient, i.e., it fell below an objective standard of reasonableness. 466 U.S. at 688. To make this showing, Moore must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance that might be considered sound trial strategy. Id. at 689. Second, he must demonstrate there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Kimmelman, 477 U.S. at 375; Williamson, 110 F.3d at 1514.

The above-quoted portions of the trial transcript clearly demonstrate the waiver of closing argument was the product of a strategic decision on the part of defense counsel designed to prevent the district attorney from giving a second summation. Indeed, the

transcript indicates defense counsel believed the trial court's decision to allow a second summation by the prosecution was contrary to Oklahoma law and would be reversed on appeal. Although the trial court's ruling was ultimately affirmed on direct appeal, we are unable to say defense counsel's decision to waive closing argument was anything less than an informed strategic choice. See Flamer v. State of Delaware, 68 F.3d 710, 732 (3d Cir. 1995) (defense counsel's waiver of closing argument in guilt phase of trial was within wide range of reasonable professional assistance where counsel's strategy was to avoid devastating rebuttal from prosecution and prosecutorial tactic of giving very brief opening statement and lengthy rebuttal had been employed in other cases); United States ex rel. Spears v. Johnson, 463 F.2d 1024, 1026 (3d Cir. 1972); see also Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995) ("For counsel's advice to rise to the level of constitutional ineffectiveness, the decision . . . must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'") (quoting United States v. Ortiz Oliveras, 717 F.2d 1, 4 (1st Cir. 1983). Accordingly, we reject Moore's argument that defense counsel's performance in this regard was constitutionally deficient.

Even assuming, arguendo, that defense counsel's performance was professionally unreasonable, we conclude Moore cannot demonstrate he was prejudiced  Where, as here, "the alleged ineffective assistance occurred during the penalty phase of a capital trial, we consider whether there is a 'reasonable probability that, absent the errors, the sentencer--

-29-

including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Duvall, 1998 WL 97748 at *4 (quoting Strickland, 466 U.S. at 695). Although we have never addressed the precise issue raised by Moore, the Fifth Circuit has held that, in order to demonstrate prejudice in these circumstances, a habeas petitioner must make some type of showing of what defense counsel might have said at closing that would have had a reasonable probability of changing the result. Sawyer v. Butler, 848 F.2d 582, 592 (5th Cir. 1988), aff'd, 497 U.S. 227 (1990). Here, Moore offers no hypothetical arguments that can satisfy this standard. Although the jury was presented with mitigating evidence from Moore's family and friends, it was also faced with extremely damaging evidence of Moore's involvement in the murder. In particular, the jury was able to consider all of the evidence presented during the guilt phase of trial and most, if not all, of it overwhelmingly pointed to Moore's guilt. The evidence indicated Moore intended to shoot Fernandez when he entered the motel, and that he shot Fernandez five times in the back of the head while Fernandez was lying facedown on the bathroom floor. In addition, the prosecution admitted evidence at the penalty phase indicating Moore had been previously convicted of robbery and had attempted to use a firearm during an altercation with an acquaintance. In light of the strength of the State's evidence, and the weakness of any evidence in mitigation, we conclude there is no reasonable probability that, had Moore's defense counsel given a closing argument, the

jury would have chosen life over death.  See Duvall, 1998 WL 97748 at *4.

**Ineffective assistance of appellate counsel**

Moore was represented on direct appeal by Pete Gelvin of the Oklahoma County Public Defenders' office.  Gelvin raised the following points on direct appeal: (1) the trial court's admission into evidence of two photographs depicting the victim; (2) the trial court's refusal to appoint a ballistics expert to cast doubt on the testimony of the State's ballistics expert; (3) Moore's culpability was not proven to be great enough to allow imposition of the death penalty in light of the jury's refusal to find he committed murder with malice aforethought; (4) denial of a jury that was representative of a fair cross-section of the community; (5) the trial court's refusal to provide funds for trial counsel to travel to Texas to interview witnesses; (6) the trial court's refusal to compel presence of two inmate witnesses from Texas; (7) the trial court's decision to allow prosecutor to make second argument during the penalty phase after Moore waived summation; (8) the trial court's refusal to allow Moore to give a closing statement after he had initially waived summation; (9) the trial court's decision to allow prosecutor to make improper and redundant comments during closing argument in penalty phase; and (10) improper remarks by prosecutor during closing summation at penalty phase.  Moore contends Gelvin also should have raised the following arguments on direct appeal: (1) the trial court's denial of motions for expert assistance; (2) lack of corroboration of Caster's

testimony; (3) invalid basis for continuing threat factor; (4) improper prosecutorial remarks during summation; (5) the trial court's admission of prejudicial hearsay statements; and (6) ineffective assistance of trial counsel.

The district court addressed these arguments on the merits and found them to be meritless. Our scope of review is de novo. Brewer, 51 F.3d at 1523. Moore must show, as with his claims of ineffective trial counsel, that appellate counsel's performance was deficient and that the deficient performance was prejudicial. See United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995).

*Failure to raise denial of motions for expert assistance.* Prior to trial, Moore's counsel filed motions requesting appointment of a ballistics expert, appointment of a parole and probation expert to testify at the penalty phase concerning Moore's amenability to rehabilitation, appointment of a sociologist to testify on the rate of recidivism among capital murderers, appointment of a psychiatrist, funds for travel expenses incurred in locating and interviewing witnesses, and funds to conduct a presentence investigation aimed at discovering mitigating evidence and disproving the aggravating factor that Moore presented a future danger. On direct appeal, Moore's appellate counsel challenged only the denial of the appointment of the requested ballistics expert. In his habeas petition, Moore contends appellate counsel was ineffective for failing to challenge denial of the remaining pretrial requests. For the reasons outlined in our discussion of these remaining pretrial requests on their merits, we conclude Gelvin

was not ineffective in failing to raise these issues on direct appeal.

*Failure to raise the lack of corroboration of Caster's testimony.* Moore contends Gelvin should have raised the lack of corroboration of Caster's testimony on direct appeal. Under Oklahoma law, testimony of an accomplice must be corroborated in at least one material fact by independent evidence. See, e.g., Spears v. State, 900 P.2d 431, 440 (Okla.Crim.App. 1995) (citing Okla. Stat. Ann. tit. 22, § 742). Here, it was uncontroverted Caster was an accomplice, see Carter v. State, 879 P.2d 1234, 1246 (Okla.Crim.App. 1994) (outlining test used to determine if witness is an accomplice), and the trial court accordingly instructed the jury her testimony had to be corroborated.

In rejecting Moore's initial application for post-conviction relief, where this issue was first raised, a concurring member of the Court of Criminal Appeals' panel specifically concluded Caster's testimony was sufficiently corroborated. Likewise, the federal district court concluded Caster's testimony was "corroborated in several respects, including Petitioner giving the murder weapon to his brother-in-law, his statements to his ex-wife about leaving a corpse if necessary to stay out of trouble, the burglary of the guns and other items from the Setzkorn residence, and Petitioner's possession of the stolen guns." District Court's Opinion at 34.

After carefully reviewing the trial transcript, we agree with the district court's analysis. In each of the specific instances noted by the district court, independent witnesses corroborated Caster's testimony on material facts. Although the corroborating

-33-

testimony did not constitute complete, independent proof of the crime, it sufficiently connected Moore to the murder and allowed the jury to infer Caster's entire testimony was truthful. See Spears, 900 P.2d at 440. We conclude Gelvin's failure to raise this issue on direct appeal did not violate the Strickland standard.

*Failure to raise issue of invalid basis for continuing threat aggravating factor.* Moore contends Gelvin erred in failing to attack the prosecution's use of an unadjudicated crime (i.e., Moore's brandishing of a firearm at an acquaintance during an altercation) to prove Moore was a continuing threat to society. He acknowledges we have concluded "consideration of evidence of unadjudicated crimes in imposing the death sentence does not violate a petitioner's due process rights." Hatch v. Oklahoma, 58 F.3d 1447, 1465 (10th Cir. 1995). Accordingly, Moore states he is simply preserving the issue "for possible *en banc* treatment and/or for *certiorari* review." Opening Brief, at 53.

*Failure to challenge improper prosecutorial remarks during summation.* For the reasons outlined in greater detail below, we conclude appellate counsel was not ineffective for failing to raise this issue on direct appeal.

*Failure to challenge admission of prejudicial hearsay.* At trial, the prosecution elicited hearsay statements attributed to the victim regarding a dispute he had with Moore a few days prior to the murder. Margie VanWinkle, a clerk at the Airline Motel, testified that, several days prior to the murder, Fernandez told her Moore had stopped by the motel and asked for a room. VanWinkle further testified that, according to Fernandez, Moore

-34-

became angry when Fernandez would not let him have a room, and said to Fernandez before leaving, "Well, I'll see to that." Trial Transcript at 735. Sam Hemani, the owner of the Airline Motel, testified Fernandez told him during the week prior to the murder that Moore had stopped by the motel and asked for a free room. When Fernandez refused, Moore threatened his life. Id. at 758. Hemani also testified that Fernandez said he felt threatened and was afraid of Moore. Id. at 757.

According to Moore, VanWinkle's and Hemani's testimony constituted inadmissible and prejudicial hearsay that should have been challenged on direct appeal. Under Oklahoma law, "[a] victim's hearsay statements describing threats and beatings are admissible to show the victim's state of mind and indicate fear of a defendant." Hooper v. State, 947 P.2d 1090, 1102 (Okla.Crim.App. 1997) (citing Okla. Stat. Ann. tit. 12, § 2803(3)). A concurring member of the Oklahoma Court of Criminal Appeals panel that considered Moore's first application for post-conviction relief specifically rejected the identical argument now raised by Moore:

> The testimony of VanWinkle . . . and of [Hemani] . . . was admitted to show that the victim feared the petitioner. They each repeated statements by the victim to them demonstrating that Fernandez had become afraid of petitioner. The trial court offered to give the jury an instruction limiting the jury's consideration of the evidence to the victim's state of mind. The defense refused it, therefore, no error resulted.

809 P.2d at 66. The federal district court agreed and specifically concluded Fernandez' statements were relevant to show his fearful state of mind.

After carefully reviewing the trial transcript, we agree the challenged statements

were properly admitted under the state of mind exception to Oklahoma's hearsay rule to show Fernandez' state of mind toward Moore or to supply the motive for killing. See Williamson v. State, 812 P.2d 384, 403 (Okla.Crim.App. 1991). More specifically, we conclude the statements were relevant to prove Moore's identity as the killer and to demonstrate a motive for the killing. Id. at 404.

The more important question for purposes of this appeal is whether admission of the challenged hearsay evidence violated Moore's Sixth Amendment confrontation and cross-examination rights. See Hopkinson v. Shillinger, 866 F.2d 1185, 1200 (10th Cir. 1989). For admission of hearsay evidence to comply with the Sixth Amendment, the declarant must be unavailable and the statement must bear "adequate 'indicia of reliability.'" Ohio v. Roberts, 448 U.S. 56, 66 (1980); see also Hatch, 58 F.3d at 1467; Hopkinson, 866 F.2d at 1200. Here, the first requirement is easily satisfied because the declarant, Fernandez, was dead. The second requirement, i.e., reliability, is also arguably satisfied because the challenged hearsay statements fell within a "firmly rooted hearsay exception." Roberts, 448 U.S. at 66; see also Lenza v. Wyrick, 665 F.2d 804, 811 (8th Cir. 1981) (concluding reliability of challenged hearsay testimony could be inferred because it fell within "state of mind" exception to hearsay rule). Even if the "state of mind" exception cannot be considered a "firmly rooted hearsay exception," see Hopkinson, 866 F.2d at 1200, we conclude the challenged statements bear sufficient indicia of reliability to satisfy Sixth Amendment requirements. Specifically, both

VanWinkle and Hemani testified Fernandez was afraid of Moore because of an incident that occurred several days prior to the murder. In addition, VanWinkle's and Hemani's testimony was corroborated in part by Caster, who testified Moore talked with Fernandez several days prior to the murder and was angry at him. Because the challenged statements support each other, and are in turn supported by other evidence, we conclude they are trustworthy. See Hopkinson, 866 F.2d at 1201.

Even assuming admission of the challenged statements was error, we conclude such error was harmless. See Hopkinson, 866 F.2d at 1202. The evidence of Fernandez' statements prior to the murder was only a minor part of the prosecution's evidence. Moore's motive to kill Fernandez was also arguably demonstrated by evidence indicating Fernandez was the person who fired him from his job at the Airline Motel. Aside from the issue of motive, virtually all of the evidence pointed to Moore as the person who murdered Fernandez.

*Failure to raise ineffective assistance of trial counsel.* For the reasons outlined above, we conclude there is no merit to Moore's claims of ineffective assistance of trial counsel. Thus, Gelvin was not ineffective for failing to raise those issues on direct appeal.

**Necessity of hearing on Moore's claims of ineffective assistance of counsel**

Moore did not receive an evidentiary hearing in state court or in federal district

court on his claims of ineffective assistance. On appeal, Moore contends the district court erred in failing to grant him such a hearing.

As outlined above, many of Moore's ineffective assistance claims are procedurally barred due to his failure to raise them in his first application for post-conviction relief. Moreover, all of his ineffective assistance claims, even if they could be considered, were properly rejected on lack of prejudice grounds, obviating the necessity of an evidentiary hearing. See Hatch, 58 F.3d at 1471-72 (rejecting habeas petitioner's request for evidentiary hearing where petitioner failed to put forth any specific allegations of error that, if true, would entitle him to relief). Accordingly, we find no error on the part of the district court in failing to conduct an evidentiary hearing.

**Trial court's refusal to grant funds to hire mental health expert**

Prior to trial, Moore filed a motion requesting funds to hire a psychiatrist. In the motion, Moore's counsel alleged a belief, "based on conversations with defendant and family and actions of the defendant and the circumstances of the events," that Moore suffered "from a mental disease or defect, that would affect his capacity to appreciate the wrongfulness of his conduct, that he did not know right from wrong at the time of these acts allegedly occurred or conform his requirements to law." Opening Brief at 61. The motion also indicated there was "a likelihood" Moore was under the influence of PCP at the time the crime was committed. In closing, the motion indicated psychiatric assistance

was necessary to help present a defense to the charged crime and to present mitigating circumstances at a penalty phase if necessary. The trial court denied Moore's motion.

Moore did not challenge the court's ruling on direct appeal. Instead, the issue was first raised in his initial application for post-conviction relief filed in state court. The trial court rejected Moore's arguments, noting Moore's defense at trial was not insanity, but rather "that there was reasonable doubt that it was he who committed the acts upon which this murder prosecution [wa]s based," and "that his accomplice, Vicki Caster, committed the murder." Order Denying Post-Conviction Relief, at 5. The court further emphasized there was "no showing . . . that insanity was likely to be a significant factor at trial or at the sentencing proceeding," and "no psychiatric evidence was presented by the State at the sentencing proceeding." Id. at 6. The Court of Criminal Appeals affirmed the denial of Moore's post-conviction application without specifically commenting on this particular issue. In his federal habeas petition, Moore contends the trial court violated his equal protection and due process rights by denying his request for expert mental health assistance. Although Moore acknowledges the issue was not raised on direct appeal, he asserts the "cause" for failure to raise the issue was ineffective assistance of appellate counsel.

In Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide

access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Id. at 74. This obligation is not limited to the guilt phase of a capital proceeding. Rather, Ake emphasized the obligation extends to the sentencing phase of a capital proceeding "when the State presents psychiatric evidence of the defendant's future dangerousness." Id. at 83. Citing Ake, we have held that "due process requires the appointment of a mental health expert to assist the defendant in the penalty phase when the State presents evidence, psychiatric or otherwise, concerning the defendant's future dangerousness, and the defendant establishes the likelihood that his mental condition could have been a significant mitigating factor." Brewer, 51 F.3d at 1529 (citing Liles v. Saffle, 945 F.2d 333, 341 (10th Cir. 1991)).[4]

In Caldwell v. Mississippi, 472 U.S. 320 (1985), the Supreme Court clarified Ake by holding a criminal defendant seeking appointment of a mental health expert must offer "more than undeveloped assertions that the requested assistance would be beneficial." Id. at 323 n.1 Likewise, we have outlined the showing a criminal defendant must make to be entitled to appointment of a mental health expert:

If "sanity" or "mental capacity" defenses [are] to be defense issues, they

_____

[4] Other circuits have narrowly construed Ake as creating an entitlement to assistance of a mental health expert during sentencing only when the state offers psychiatric evidence of defendant's future dangerousness. See, e.g., Goodwin v. Johnson, 132 F.3d 162, 189 (5th Cir. 1997). In Goodwin, the Fifth Circuit opined that recent Supreme Court cases suggest the Court narrowly interprets Ake as well. Id. (citing Tuggle v. Netherland, 516 U.S. 10 (1995), and Simmons v. South Carolina, 512 U.S. 154, 164 (1994)).

-40-

must be established by "a clear showing" by the indigent defendant as "genuine," "real" issues in the case. In order for a defendant's mental state to become a substantial threshold issue, the showing must be clear and genuine, one that constitutes a close question which may well be decided one way or the other. It must be one that is fairly debatable or in doubt.

Liles, 945 F.2d at 336. "General allegations supporting a request for court appointment of a psychiatric expert, without substantive supporting facts, and undeveloped assertions that psychiatric assistance would be beneficial to the defendant will not suffice." Id. at 336.

Where, as here, "Ake was decided after trial but while direct appeal was pending, [the] inquiry differs" slightly. Castro v. State of Oklahoma, 71 F.3d 1502, 1513 (10th Cir. 1995). Specifically, the question presented is whether, upon review of the entire record, the habeas petitioner could have made a threshold showing under Ake that his sanity at the time of the offense was to be a significant factor at trial. Id. (citing Liles, 945 F.2d at 336). "This reformulated standard also applies to determinations whether due process requires the state-funded appointment of expert psychiatric assistance during the sentencing phase." Id. In applying this modified standard, we have looked at evidence available to defendant at the time the request for mental health assistance was made, as well as evidence generated thereafter. See id. at 1514-15 (considering psychological evaluations submitted with habeas petition); Liles, 945 F.2d at 336-40 (considering psychological and psychiatric testimony obtained from experts during the course of the habeas proceedings).

The federal district court concluded Moore's "mental condition was not a significant factor during the guilt/innocence phase of his trial," and "[t]here was no evidence available to the trial court suggestive of emotional or mental disturbance indicating that [Moore's] sanity at the time of the offense was to be a significant factor in his defense." District Court's Order, at 42. We agree with these conclusions. Although the psychological evidence now pointed to by Moore may have constituted legitimate mitigating evidence, it did not demonstrate he was incompetent at the time of the crime, and thus provided no defense during the guilt phase of trial. Moreover, the sole focus of Moore's defense during the guilt phase was that Caster, rather than Moore, murdered Fernandez.

With respect to the sentencing phase, the district court concluded the trial court did not err in refusing to appoint a mental health expert because Moore "failed to demonstrate any significant nexus between the defense mitigation strategy and the lack of court-appointed expert psychiatric assistance." District Court's Order, at 43. The district court stated "the proffered psychological assessments . . . cannot be said to indicate why [Moore] murdered Alex [Fernandez]." Id. at 44. Further, the court noted the "mitigation strategy employed by the defense . . . was to show that [Moore] came from a loving family background, was a good employee, but that he had a history of involvement with drugs that affected the choices he made." Id. Ultimately, the court emphasized, because "the defense strategy did not endeavor to make [Moore's] past or present mental

-42-

condition a significant mitigating factor, . . . no error of constitutional magnitude occurred." Id. As an alternative basis for rejecting Moore's claim, the district court concluded any error in rejecting Moore's request for a mental health expert was harmless. Id. at 45-47.

In determining if the trial court erred in denying assistance of a mental health expert for purposes of the sentencing phase, we must first decide whether Moore has established the likelihood that his mental condition could have been a significant mitigating factor. Castro, 71 F.3d at 1515. In an attempt to make this showing, Moore has submitted two exhibits as attachments to his petition for writ of habeas corpus filed in federal district court, a psychological report prepared by Patricia Fleming, Ed.D., after evaluations of Moore on October 12, 1992, November 13, 1992, and February 23, 1993, and a social history investigation report prepared by forensic social worker Jill Miller, dated February 28, 1995. Fleming's report diagnoses Moore as suffering from attentional deficit disorder, major depression, and organic mental disorder, and concludes Moore has related problems of alcohol abuse and polydrug abuse. The report contains no specific conclusions with respect to how Moore's psychological problems may have related to the murder, nor does the report specifically discuss Moore's future dangerousness. Miller's report, which incorporates Fleming's conclusions, goes somewhat further. In the assessment portion of her report, Miller notes children with learning disabilities, such as ADD, can "experience failure and frustration," and "externalize these feelings by acting

-43-

out in school, at home, or in the community." Appendix at 203. Miller further notes "[t]here is a strong link between affective disorders, such as depression and bipolar disorder, untreated, and substance abuse, including alcoholism." Id. at 205. According to Miller, "[r]esearch has revealed that chronic and heavy substance abuse can lead to organic damage to the brain," which can in turn affect "memory, volition, purpose, reality testing, emotion, communication, awareness and understanding of consequences." Id. at 208. Miller's report suggests "depression and manic-depression (bi-polar) is treatable," and such treatment can prevent "acting out." Id. at 210. Although many of her conclusions are general, rather than focused specifically on Moore's situation, Miller's report arguably suggests if Moore were to receive proper psychiatric treatment for his mental disorders, he would be less likely to commit future crimes and, in short, would be less dangerous to society.[5]

Based upon this information, we conclude Moore has established a likelihood that his mental condition could have been a mitigating factor at the sentencing phase. In particular, the evidence suggests Moore could have presented some evidence to counter the prosecution's assertion that he represented a continuing threat to society. Accordingly, we disagree with the district court's conclusion that due process did not require appointment of a mental health expert during the sentencing phase of Moore's

---

[5] There is no indication in Miller's report that Moore's alleged organic brain damage is treatable.

trial.

Assuming Moore was constitutionally entitled to the assistance of a mental health expert at the sentencing phase of trial, the question then becomes whether lack of such assistance was harmless error. Castro, 71 F.3d 1515. More specifically, the ultimate inquiry is: "Do [we] harbor a significant doubt that this evidence would have caused at least one juror to choose life rather than death?'" Id. at 1516 (quoting Brecheen, 41 F.3d at 1373). In Castro, we were faced with this identical question, having concluded defendant was improperly denied funds for expert psychiatric assistance during the sentencing phase. In concluding the error was not harmless, we noted the jury, during sentencing-phase deliberations, sent a note to the trial court asking "Exactly what is meant by a life sentence?" Id. We concluded this question indicated "it was not self-evident to the jury whether [the defendant's] crime warranted the death penalty." Id. Next, we noted the prosecution had relied on the continuing threat aggravating circumstance and thus had placed defendant's mental status at issue. Finally, and most importantly, we noted that on direct appeal, the Oklahoma Court of Criminal Appeals had struck down the only other aggravating circumstance, i.e., the especially heinous, atrocious, and cruel aggravating circumstance, on insufficient evidence grounds. Id. The striking down of this factor, we concluded, combined with the fact that defendant should have been allowed to present mitigating evidence concerning his mental health, "alter[ed] the balance by decreasing the relative weight of the aggravating evidence while

-45-

simultaneously increasing the weight of the mitigating evidence." Id.

A comparison of this case to Castro is in order. Although the jury in this case did not send a note to the trial court asking what was meant by a life sentence, it did send a note asking for clarification of Instruction No. 11, which stated: "If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed." Trial Transcript at 1159. The court responded: "Unless you unanimously find that the aggravating circumstances outweigh the mitigating circumstances, the death penalty shall not be imposed." Id. at 1209. Approximately one hour later, the jury returned its verdict imposing the sentence of death. Unlike Castro, it is unclear what inferences, if any, can be drawn from the jury's note in this case.

This case is identical to Castro in one regard, in that the jury found the existence of the "especially heinous, atrocious and cruel" aggravating circumstance, only to have that circumstance subsequently stricken by the Oklahoma Court of Criminal Appeals on insufficiency of evidence grounds. Thus, as in Castro, the Oklahoma Court of Criminal Appeals' action decreased the relative weight of the aggravating evidence. However, unlike Castro, in this case there was more aggravating evidence in the beginning because the jury found the existence of three other aggravating circumstances (previous conviction of a felony involving use or threat of violence; murder committed for purpose

-46-

of avoiding or preventing lawful arrest or prosecution; and existence of a probability that Moore would commit criminal acts of violence that would constitute a continuing threat to society).

In the end, we conclude this case is distinguishable from Castro, and the trial court's failure to appoint a mental health expert to assist in the penalty phase was harmless. Under Oklahoma law, proof of the continuing threat aggravating factor is based on "the circumstances surrounding the murder for which the defendant has just been convicted and his prior criminal conduct." Douglas v. State, 951 P.2d 651, 675 (Okla.Crim.App. 1997). Thus, even though the "heinous, atrocious or cruel" aggravating factor was thrown out by the Oklahoma Court of Criminal Appeals, most, if not all, of the evidence presented at the sentencing phase could still have been properly considered by the jury. In particular, the jury could have still considered the manner in which Fernandez was murdered, as well as Moore's history of violent behavior. This evidence, combined with evidence of Moore's previous felony conviction and evidence indicating he murdered Fernandez in part to escape capture, was significant. We are not persuaded the mental health evidence now pointed to by Moore, none of which particularly explains why he chose to murder Fernandez, would have convinced one or more jurors to choose life over death.

**Denial of application for appointment of ballistics expert and other experts**

-47-

Moore contends the trial court violated his due process rights by refusing to appoint a ballistics expert and other experts to assist in his case. According to Moore, the state's firearms examiner was a crucial witness who corroborated Caster's testimony by affirmatively linking the shell casings found at the crime scene to the .22 rifle Moore left with his brother-in-law after the crime. Moore argues that, "[h]ad an independent test showed that the .22 was not the murder weapon, Ms. Caster's credibility, and with it the entire State's case, would have been seriously undermined." Opening Brief at 70. Moore also argues other experts should have been appointed (i.e., a sociologist to testify as to the rate of recidivism among capital murders, and a parole and probation expert to testify concerning whether Moore was capable of rehabilitation and whether he could someday become a productive member of society) who could have presented mitigating evidence during the penalty phase of his trial.

"The Fifth Amendment's guarantee of fundamental fairness entitles indigent defendants to a fair opportunity to present their defense at trial." United States v. Kennedy, 64 F.3d 1465, 1473 (10th Cir. 1995). Although this does not entitle indigent defendants to "all the assistance that . . . wealthier counterpart[s] might buy," it does entitle them "to the basic and integral tools" needed to present an adequate defense. Id. (citing Ake, 470 U.S. at 77). "To determine what basic tools are required, we consider three factors: (1) the effect on [the petitioner's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the

-48-

service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered." Id. (citing Ake, 470 U.S. at 78-79).

Without analyzing the first two factors, it is apparent Moore's arguments fail on the third factor. Although Moore has attempted to show the probable value of each of the requested experts (particularly the ballistics expert), he has not shown how denial of their appointments caused any substantial prejudice at either the guilt or sentencing phases of trial. Rather, his arguments as to what the requested experts might have said are entirely speculative. In short, Moore has "offered little more than undeveloped assertions that the requested assistance would be beneficial," and thus "no deprivation of due process" resulted from the trial court's denial of the requested assistance. Caldwell, 472 U.S. at 323 n.1.

**Withholding of exculpatory evidence**

While preparing materials for Moore's second post-conviction application, Moore's attorney sent an investigator to the Oklahoma City Jail to look for records relating to a dismissed criminal charge that had been used by the State in proving the future dangerousness aggravating factor. While at the jail, the investigator discovered what appeared to be the entire investigative file on the Fernandez murder case, a file that had never before been produced to Moore or any of his attorneys. In his habeas petition,

Moore contends the prosecution violated his due process rights by withholding this file which, Moore contends, contained references to other possible suspects in the murder, results of a scientific examination that showed a scalp hair recovered from the tennis shoe of Fernandez did not come from Fernandez or Moore, and information that witness Robin Idecker, who testified at trial that Moore and Caster visited her home after the Setzkorn burglary and brought in stolen firearms, initially told police she had no knowledge of this and had not seen Caster during the time period in question.

To establish a Brady violation, "'the [petitioner] must prove that the prosecution suppressed the evidence, the evidence would have been favorable to the accused, and the suppressed evidence was material.'" Smith v. Roberts, 115 F.3d 818, 820 (10th Cir. 1997) (quoting Fero v. Kerby, 39 F.3d 1462, 1472 (10th Cir. 1994)). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different," i.e., "when the Government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quotations omitted). In determining whether petitioner has satisfied these requirements, the court views the undisclosed evidence in relation to the record as a whole, as the materiality of exculpatory evidence will vary with the overall strength of the government's case. Smith v. Secretary of New Mexico Dept. of Corrections, 50 F.3d 801, 827 (10th Cir. 1995).

In his habeas petition, Moore acknowledges "that at the present time he does not

believe he is able to shoulder successfully the daunting burden required by <u>Brady</u> and its progeny to demonstrate the effect of the violation." Opening Brief at 74. We agree. Viewing the items of undisclosed evidence in light of the entire record, we conclude there is no reasonable probability the outcome of the trial would have been different had the evidence been disclosed in a timely fashion to the defense. Thus, the evidence is not material.

**Prosecutor's penalty-phase summation**

Moore objects to numerous statements made by the prosecutor during summation in the penalty phase of trial, contending they deprived him of due process. Specifically, he contends: (1) the prosecutor informed the jury they did not bear final responsibility for the death verdict since they were "a small piece of the machinery that is designed to take people like Scotty Lee Moore and put them on death row"; (2) the prosecutor appealed to the patriotism of the jury, comparing service in the military during time of war with returning a death sentence; (3) the prosecutor "personalized the decision to seek the death penalty as one he himself made"; (4) the prosecutor commented extensively on Moore's courtroom demeanor as showing "no emotion"; and (5) the prosecutor personalized the interests of society as "you and me" and "[w]e're the ones he is a threat to unless something is done about it." Opening Brief at 76.

Moore objected to the patriotism comment on direct appeal and the Oklahoma

Court of Criminal Appeals concluded the remark was not improper. 736 P.2d at 167. In his initial application for post-conviction relief, Moore objected to the remainder of the comments. Both the trial court and the Oklahoma Court of Criminal Appeals concluded these arguments were barred under the doctrine of res judicata. 809 P.2d at 64. The federal district court reviewed each of the challenged comments on the merits and concluded none of them undermined the fundamental fairness of the sentencing proceedings or warranted relief. District Court's Opinion at 52-58.

We review allegations of prosecutorial misconduct de novo. Fero, 39 F.3d at 1473. Prosecutorial misconduct does not warrant federal habeas relief unless the conduct complained of "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). In evaluating a claim of prosecutorial misconduct based on improper remarks made by the prosecutor, we have stated:

> To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly "could have tipped the scales in favor of the prosecution." . . . We also ascertain whether curative instructions by the trial judge, if given, might have mitigated the effect on the jury of the improper statements . . . . When a prosecutor responds to an attack made by defense counsel, we evaluate that response in light of the defense argument. . . . Ultimately, we "must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly."

Fero, 39 F.3d at 1474 (citing Hopkinson, 866 F.2d at 1210).

After reviewing the transcript of the sentencing proceeding, we are unable to

conclude any of the challenged prosecutorial comments, even if improper, was significant enough to influence the jury's sentencing decision. Moreover, we conclude the district court's detailed analysis of each comment is entirely correct and adopt that reasoning in rejecting Moore's claims.

**Cumulative effect of <u>Brady</u> violation and remarks in closing arguments**

With little discussion, Moore asserts a cumulative error argument by pointing to the combination of the improper withholding of <u>Brady</u> material and the improper prosecutorial remarks during the penalty-phase closing. Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors. <u>Hoxsie v. Kerby</u>, 108 F.3d 1239, 1245 (10th Cir. 1997), <u>cert. denied</u>, 118 S.Ct. 126 (1997). We evaluate whether cumulative errors were harmless by determining whether a criminal defendant's substantial rights were affected. <u>United States v. McKneely</u>, 69 F.3d 1067, 1080 (10th Cir. 1995). Here, Moore concedes he cannot demonstrate any prejudice arising from the alleged <u>Brady</u> violation, and thus concedes he cannot demonstrate his substantial rights were affected by the alleged combination of errors.

**Trial court's refusal to grant defense counsel closing argument after prosecutor's second summation**

Moore contends the trial court violated his due process rights when, during the

penalty phase, it denied defense counsel's request to give a closing argument after the prosecution had given its second summation. This issue has already been discussed at length in connection with Moore's claim of ineffective assistance. Although the Sixth Amendment right to counsel encompasses the right to have defense counsel present at closing summation, Herring v. New York, 422 U.S. 853, 860 (1975), Moore chose to waive that right at trial. In light of the lengthy discussion that took place between the trial court and defense counsel regarding the waiver issue, we conclude there is no basis for Moore to now contend the trial court erred in failing to rescue him from his decision to waive closing argument. Instead, we conclude the entire issue must rise or fall on the question of whether Moore received ineffective assistance of counsel in deciding to waive his closing argument.

**Reweighing aggravating and mitigating factors by Oklahoma Court of Criminal Appeals**

In his first application for post-conviction relief, Moore argued the evidence presented during the sentencing phase was insufficient to support the jury's finding that the murder was "especially heinous, atrocious or cruel." The Oklahoma Court of Criminal Appeals agreed the evidence presented at Moore's trial did not support this aggravating circumstance, as it had been interpreted and limited in Stouffer v. State, 742 P.2d 562 (Okla.Crim.App. 1987) (holding circumstance applicable only to those murders in which torture or serious physical abuse to any of the victims is present). Moore, 809

P.2d at 65. The court then conducted a mandatory sentence review by reweighing the aggravating and mitigating circumstances and concluded the evidence was sufficient to support the remaining three aggravating circumstances found by the jury: that Moore would constitute a continuing threat to society, that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and that Moore was previously convicted of a felony involving the use or threat of violence to the person. The court also noted Moore had "presented much evidence in mitigation," including "the animosity between [Moore] and the deceased, the love and concern of [Moore's] family, [Moore's] drug problem, [Moore's] record of being a good and likeable worker on his job, [Moore's] immature behavior around guns, [Moore's] age, [Moore's] level of education and the absence of a father figure during his childhood." Id. After discarding the evidence supporting the stricken "especially heinous, atrocious or cruel" aggravating circumstance, and reweighing the remaining aggravating and mitigating evidence, the court found "the sentence of death to be factually substantiated and appropriate." Id. at 66.

In his federal habeas petition, Moore contends the Court of Criminal Appeals' reweighing was improper because it did not scrutinize the import and effect of the invalid aggravating circumstance on the jury's sentencing verdict. In support of his contention, Moore cites to Stringer v. Black, 503 U.S. 222 (1992). We conclude Moore has misconstrued Stringer.

-55-

In <u>Clemons v. Mississippi</u>, 494 U.S. 738 (1990), the Supreme Court held nothing in the Constitution requires that a jury impose the sentence of death or make findings prerequisite to imposition of such a sentence. Accordingly, the Court concluded a defendant's constitutional rights are not " infringed where an appellate court invalidates one of two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that the one or more valid remaining aggravating factors outweigh the mitigating evidence." <u>Id.</u> at 745. Likewise, the Court held a defendant's constitutional rights are not violated when an appellate court applies harmless-error analysis in reviewing a death sentence imposed in reliance on an improper aggravating factor. <u>Id.</u> at 752.

Two years later, in <u>Stringer</u>, the Court simply reemphasized that "close appellate scrutiny of the import and effect of invalid aggravating factors [was necessary] to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases." 503 U.S. at 230. Accordingly, the Court noted that, "[i]n order for a state appellate court to affirm a death sentence after the sentencer was instructed to consider an invalid factor, the court must determine what the sentencer would have done absent the factor." <u>Id.</u> To accomplish this, the Court held, a state appellate court in a weighing state must either conduct harmless-error analysis or independently reweigh the aggravating and mitigating evidence. Contrary to Moore's contentions, <u>Stringer</u> does not require a state appellate court, when actually reweighing

-56-

aggravating and mitigating evidence, to discuss the effect the invalid aggravating factor had on the jury's original sentencing decision. Instead, the appellate court's independent reweighing of the evidence is sufficient to satisfy the Eighth Amendment.

In light of Moore's arguments, we find it necessary to review the merits of the Court of Criminal Appeals' decision affirming Moore's death sentence. Employing a de novo standard, we review the decision reweighing the aggravating and mitigating factors to determine whether that court afforded petitioner "an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime." Clemons, 494 U.S. at 749. The court's factual findings as to the mitigating and aggravating factors are reviewed under the "rational factfinder" standard. Lewis v. Jeffers, 497 U.S. 764, 783 (1990); Stafford, 34 F.3d at 1569.

Here, three aggravating factors were firmly established by the evidence. First, it was uncontroverted Moore had previously been convicted of robbery, a crime involving the use or threat of violence to another person. Second, evidence introduced at trial (particularly evidence from Caster) suggested one of Moore's motives for murdering Fernandez was to prevent him from talking or identifying Moore as the robber. Therefore, there was sufficient evidence to conclude Moore committed the murder for the purpose of avoiding or preventing a lawful arrest or prosecution. Third, the horrendous facts of Fernandez' murder, combined with evidence of other violent and criminal behavior on the part of Moore (e.g., brandishing a gun at an acquaintance; burglarizing of

the Setzkorn residence; attempted escape from police following the murder), clearly demonstrated Moore constituted a continuing threat to society. Although Moore presented a significant amount of mitigating evidence, particularly testimony from family members outlining his childhood, his distant relationship with his father, and his involvement with drugs, none of the mitigating evidence provided a compelling explanation for Moore's behavior. We conclude the three remaining aggravating circumstances clearly outweighed the mitigating evidence presented by Moore and warranted imposition of the death penalty.

**Trial court's refusal to appoint expert on parole eligibility**

Moore contends the trial court violated his constitutional rights by refusing to appoint him a parole or probation expert who could have testified during the sentencing phase regarding the amount of time Moore would have spent in prison if given a life sentence. Apparently, Moore believes such testimony would have diminished the prosecution's argument that he posed a continuing threat to society. Moore also contends the court erred in failing to instruct the jury on his likelihood of parole if he was given a life sentence.

In support of his contentions, Moore relies on Simmons v. South Carolina, 512 U.S. 154 (1994), where the Court held a capital defendant must be permitted to inform his sentencing jury he is parole-ineligible if the prosecution argues he presents a future

danger. The district court concluded <u>Simmons</u> was inapplicable since petitioner was eligible for parole under the Oklahoma sentencing scheme in existence at the time of petitioner's trial. Although it is arguable <u>Simmons</u> can be interpreted to allow a parole-eligible defendant to present evidence of the likelihood of parole if the prosecution argues he presents a future danger, <u>see</u> <u>Brown v. Texas</u>, 118 S.Ct. 355 (1997) (four members of Court recently opined evidence of likelihood of parole should be admissible in capital sentencing phase where jury is asked to assess defendant's future dangerousness), it is unnecessary for us to decide the issue. In June 1997, the Supreme Court concluded (in a 5-4 opinion) <u>Simmons</u> is a new rule that, under the <u>Teague</u> doctrine, cannot be used to disturb a habeas petitioner's death sentence that became final prior to <u>Simmons</u>. <u>O'Dell v. Netherland</u>, 117 S.Ct. 1969 (1997). Here, it is uncontroverted Moore's death sentence became final well prior to <u>Simmons</u>. Accordingly, we find it unnecessary to address his arguments concerning the trial court's failure to appoint a parole expert or to instruct the jury on his parole eligibility if given a life sentence.

**District court's denial of motion to amend habeas petition**

Approximately two years after filing his initial petition in this case, Moore sought leave to amend his petition to add an additional ineffective assistance of appellate counsel claim based on the decision in <u>Williamson v. Reynolds</u>, 904 F.Supp. 1529 (E.D.Okla. 1995), in which the court concluded the "continuing threat" aggravating circumstance

was unconstitutional.  The federal district court denied Moore's request to amend, concluding Moore's request was untimely and that, in any event, the claim sought to be added was not a "dead bang" winner.  On appeal, Moore contends the district court erred in denying his request to amend.

We review the district court's denial of Moore's motion to amend his habeas petition for abuse of discretion.  Stafford, 34 F.3d at 1560.  When a district court refuses leave to amend, it must state its reasons.

> A district court should apply Fed. R. Civ. P. 15(a) to decide whether to allow an amendment.  Rule 15(a) allows the judge to deny a motion to amend because of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.

Id. (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

We conclude the court did not abuse its discretion in denying Moore's motion to amend.  The district court was correct in concluding Moore's request was untimely.  Moore filed a second application for post-conviction relief in state court prior to filing his federal habeas action.  In that application, Moore challenged the "continuing threat" aggravator on several grounds, including the ground that the aggravator was "unconstitutionally overbroad."  For whatever reason, Moore chose not to include this argument in his federal habeas petition.  By waiting over two years to seek leave to add this claim to his federal petition, Moore's counsel delayed an unreasonable amount of time.  Even if Moore had been allowed to amend his petition to add the claim, the

-60-

amendment would have been futile because the claim sought to be added has already been

rejected by this court. See Nguyen, 131 F.3d at 1353-54 (10th Cir. 1997) (rejecting

decision in Williamson and concluding "continuing threat" aggravator satisfied

constitutional standards); see also Castro v. Ward, ___ F.3d ___, 1998 WL 113193 at *3-

4 (10th Cir. 1998) (same).

III.

The judgment of the district court is AFFIRMED.

No. 97-6065 – Moore v. Reynolds

**BRORBY**, Circuit, Judge, dissenting.

Because I believe the failure to address a jury with closing remarks in the sentencing phase of a capital case is a fundamental error that leaves an irreparable taint on subsequent jury deliberations, I must dissent from the section of the majority opinion entitled "*Penalty-phase summation waiver*." In that section, the majority denies Mr. Moore's claim of ineffective assistance of counsel concerning the waiver of argument during the sentencing phase of his trial. Because I believe the waiver was an example of exactly the type of error that should be considered ineffective assistance of counsel, I would grant the relief requested by Mr. Moore and send this case back for re-sentencing.

There is no such thing as a perfect trial, of course, and as a consequence, when reviewing claims of ineffective assistance of counsel, appellate courts afford attorneys a great deal of leeway in how they litigate cases.[1] However, the devastating effect of some errors simply should not be overlooked. An attorney's

---

[1] There is well-reasoned support, however, for applying closer scrutiny when reviewing an attorney's performance during the sentencing phase of a capital case. "[T]he minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death, justify a court's closer scrutiny of attorney performance at the sentencing phase." *Osborn v. Shillinger*, 861 F.2d 612, 626 n.12 (10th Cir. 1988) (citing *Strickland v. United States*, 466 U.S. 668, 704-06 (1984) (Brennan, J., concurring)).

failure to argue for his client's life during the sentencing phase of a capital case is that type of error. The absence of argument for the defendant in this situation leads inevitably, I believe, to a breakdown of the adversary system and a flawed trial.[2]

The majority evaluates Mr. Moore's claim of ineffective assistance of counsel under the standard articulated by the United States Supreme Court in *Strickland v. United States*, 466 U.S. 668 (1984). To be successful on a claim of ineffective assistance of counsel under that standard, a defendant must show "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Id.* at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. I disagree with the majority as to whether this benchmark was met.

---

[2] The waiver was not the only serious flaw in this trial. Remarkably, the trial court sent the jury out to begin its penalty-phase deliberations at 9:55 p.m. Although this was not contested as reversible error in this case, I am gravely concerned a judge would fail to consider the effect this may have on the jury's deliberations, especially when a man's life hung in the balance. The jury came back with a sentence of death at 11:25 p.m.

## Prejudice

I will first address the second, or prejudice, prong of the *Strickland* test. To meet his obligations under this prong, Mr. Moore must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The majority finds Mr. Moore's ineffective assistance claim should fail, in part, because "there is no reasonable probability that, had Moore's defense counsel given a closing argument, the jury would have chosen life over death."[3] In other words, the majority does not believe Mr. Moore has adequately demonstrated prejudice.

I do not think we can make a reasoned determination of "reasonable probability" of prejudice when confronted, as we are in this case, with an error

---

[3] The majority cites with favor a Fifth Circuit rule that in order to establish ineffective assistance of counsel for failure to give a closing argument "a habeas petitioner must make some type of showing of what defense counsel might have said at closing that would have had a reasonable probability of changing the result." This is not a rule I would embrace, for it serves no useful purpose. Any one of us could compose an argument to spare a man's life. The exact form of such an argument is beside the point; what is critical is that someone makes the argument. "To put it starkly, counsel's failure [to argue] was a virtual admission that the death penalty should be imposed upon his client." *Smith v. Stewart*, 140 F.3d 1263, 1270 (9th Cir. 1998). I see no reason for imposing this requirement unless we intend to adopt the ridiculous approach of granting or denying appeals based on the rhetorical force of proposed arguments.

by counsel that completely undermines the adversarial process. I think this question is different in kind from the usual one of determining whether an additional piece of evidence might have made a difference in the overall presentation. Here there was no presentation. How can a judge divine in any meaningful way whether the existence of an argument, as opposed to the absence of an argument, would change the minds of the jurors (or at least one juror)? The answer to such a question is pure conjecture. How can I even guess at the likely effect of what, for all practical purposes, appeared to be a concession by Mr. Moore's own attorneys that he deserved death? Perhaps the jury would have decided upon death no matter what Mr. Moore's attorney argued, but perhaps most were leaning toward a life sentence and changed their minds when Mr. Moore's attorney did not even appear to believe he could dispute the prosecution's argument. There is no way to know, or, more importantly, to even make a meaningful guess. In such a circumstance, this test is no more than a charade. I believe the *Strickland* analysis breaks down in this context and, for this reason, I would presume prejudice[4] when counsel waives argument during the

_____

[4] Considering the same question, Judge Reinhardt, of the Ninth Circuit, concluded the "failure to make a closing argument during the penalty phase of the trial denie[s] [a defendant] representation by counsel at a critical stage of the sentencing proceeding in violation of the basic constitutional principles" found in *United States v. Cronic*, 466 U.S. 648 (1984). *Gerlaugh v. Stewart*, 129 F.3d 1027, 1049 (9th Cir. 1997) (Reinhardt, J., concurring in part and dissenting in part). While I take a somewhat different approach, I agree with the ultimate conclusion that the failure to make a closing in such a proceeding

(continued...)

sentencing phase of a capital case.[5]

The Supreme Court has acknowledged a difference exists when a defendant's life is at stake. "In death cases doubts [with regard to the prejudicial effect of trial error] should be resolved in favor of the accused." *Andres v. United States*, 333 U.S. 740, 752 (1948). Furthermore,

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.[6]

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Although *Strickland* was

---

[4](...continued)
is an error so fundamental it cannot be properly analyzed under the *Strickland* standard.

[5] I would draw a distinction between the failure to argue during the guilt phase and during the sentencing phase. "The overwhelming reality of certain cases may make a finding of guilt inevitable. That inevitability, however, is never the case at the penalty hearing. At that stage, there is no set of facts and no set of legal principles that in any given case requires a rational person to vote for the death penalty." *Hopkinson v. State*, 632 P.2d 79, 195 (Wyo. 1981) (Rose, C.J., dissenting in part and concurring in part) (quoting other sources), *cert. denied*, 455 U.S. 922 (1982).

[6] "From the point of view of the defendant, [the death penalty] is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action." *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) (plurality opinion).

itself a death penalty case, it did not involve the same type of fundamental error as is found in this case. For this reason, its analysis does not fit.

In addition, even if I were not to assume prejudice, I would be unconvinced by the majority's analysis. In support of its decision, the majority points to the admission during the sentencing phase of strong evidence of Mr. Moore's guilt from the guilt phase, evidence of a previous robbery conviction, and evidence he once attempted to use a firearm during an altercation. The majority then concludes, based on the relative merit of the evidence presented by each side, there is no reasonable probability a closing argument would have affected the result. I simply do not understand how one gets to the conclusion reached by the majority, given the supporting evidence listed.[7]

I do not doubt Mr. Moore's guilt. The murder he committed was horrendous, but it does not strike me as an obvious and unquestionable candidate for the death penalty. The murder was not random – Mr. Moore knew the victim

_____

[7] Furthermore, a closing argument is far more than the sum of the proceeding evidence. Limiting the possible persuasive value of an argument to that of the evidence presented evidences a misconception of the value of argument itself.

and had several altercations with him. The murder did not involve multiple victims. The murder did not involve torture. Indeed, the only unusual aspect of the murder is the number of times Mr. Moore shot his victim in the head. As aggravating factors, the state merely offered Mr. Moore's previous conviction and an example of his apparent predisposition to violence.[8] Altogether, this strikes me as a typical example of what has become a far too common crime. It most certainly does not strike me as the type of murder for which the proper punishment is so decidedly certain I would be "unable to envision" a result other than death.[9] Put another way:

> Balancing the factors – mitigating and aggravating – involves

---

[8] And recall, the "especially heinous, atrocious or cruel" aggravating circumstance found by the jury was struck as invalid in this case on direct appeal. *Moore v. State*, 809 P.2d 63, 65 (Okla. Crim. App.), *cert. denied*, 502 U.S. 913 (1991).

[9] "Given the vast spectrum of individual opinions and feelings about the appropriateness of the death penalty, and given the basic humanity of every defendant no matter how heinous his crime, there is in every case a rational basis for a juror to vote for life imprisonment." *Hopkinson*, 632 P.2d at 195 (Rose, C.J., dissenting in part and concurring in part) (quoting other sources). *See also* Goodpaster, Gary, *The Trial For Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 300 (1983) (describing case of Bernardo Sierra, who committed twelve robberies, two maimings, and three murders within eight hours and did not receive death sentence). One need only consider the outcome of Oklahoma bombing defendant Terry Nichols' trial to doubt there are any cases where imposition of the death penalty is a sure bet.

the exercise of judicial discretion and judgment. When such balancing is required, it is the duty of defense counsel to argue why the balance should be struck in his client's favor. No matter how great the odds may seem to be against winning the argument, counsel must make the best case he can. It is not counsel's role to act as judge as well as advocate, any more than it is the district court's or this court's role to say, "Oh well, his client would have lost anyway. He had a bad argument, so there's no need for him to make any argument at all – no need to advocate – no need for representation by counsel." That kind of reasoning is squarely contrary to the elementary precepts of the adversary system.

*Gerlaugh*, 129 F.3d at 1049 (Reinhardt, J., concurring in part and dissenting in part).

I also believe the tone of the majority discussion evinces a misunderstanding of what I believe to be the most significant problem with a waiver of argument in the sentencing phase of a capital case. The real problem is not what has gone unsaid,[10] as the majority suggests, it is the potentially

---

[10] I do not want to minimize the problems inherent in what went unsaid in this case. That too is a significant problem. One court described the types of statement an attorney should have made in a similar circumstance:

> He did not ask the jury to spare the defendant's life. He did not remind the jury that [the defendant] is a human being or urge the jurors to be mindful of their awesome responsibility in deliberately choosing whether he should live or die. Nor did he emphasize to the jurors any of their legal obligations designed to prevent the arbitrary or capricious imposition of the death penalty, *e.g.*, the requirement that they base their findings upon a beyond a reasonable doubt certainty; their duty to weigh any aggravating circumstance found against any and all mitigating circumstances; the duty of each individual juror to hold fast to his honest convictions and to vote to

(continued...)

devastating effect of saying nothing at all. Simply put, a waiver of the argument

in the sentencing phase is a concession the defendant deserves to die. *See Smith*

*v. Stewart*, 140 F.3d at 1269 (suggesting failure to argue may be worse than

failure to present mitigating evidence at sentencing hearing); *Myles*, 389 So.2d at

30-31 (reversing death sentence for tepid closing argument). I can think of no

stronger signal to a jury that a defendant's life is not worth sparing, than the

failure of anyone to speak for him. When nobody in the courtroom stands up and

argues for the defendant's life, it devalues the jury system, the court, and life

itself.

Under *Strickland*, we determine whether there is a "reasonable probability

that, absent the errors, the sentencer ... would have concluded that the balance of

aggravating and mitigating circumstances did not warrant death." *Strickland*, 466

---

[10](...continued)
prevent a unanimous verdict in the event he is convinced that the death
penalty is inappropriate.

*State v. Myles*, 389 So. 2d 12, 30 (La. 1980) (on rehearing). Furthermore, in this case,
defense counsel did not even reiterate the evidence of mitigating factors presented during
the sentencing phase. I do not see how this court can measure the probable effect such
statements would have had on the jurors. Some types of errors cut so closely to the core
of the jury decision making process that application of "reasonable probability" analysis
strikes me as an absurd exercise.

U.S. at 695. For most types of mistakes attorneys make, this is an appropriate standard of review. Here, however, we had a trial where the prosecution got to stand up before the jury not just once, but on two separate occasions, *without opposition*, and argue for putting Mr. Moore to death. As far as the jury knew, Mr. Moore's own attorney could think of no answer to the prosecution's arguments. I suggest there is nothing a court can do to evaluate the effect this had on the jurors' minds, and it simply makes no sense to talk in terms of "reasonable probabilities."[11]

I raise this not out of concern for the rights of cold-blooded murderers like Mr. Moore, but out of concern for the health of the judicial system. I am troubled that our review of cases in some areas essentially has become no review

---

[11] "To attempt to assess the effect of error in this legal vacuum [of what affects a juror in the sentencing phase] is to superimpose one untestable surmise upon another. We must not pile conjecture upon conjecture and posit the decision of life or death upon a pyramid of guesses." *People v. Terry*, 390 P.2d 381, 392 (Cal.), *cert. denied*, 379 U.S. 866 (1964). I believe it draws into question the fundamental fairness of the process when courts affirm death sentences on the basis of conjecture as to how twelve jurors were affected by a breakdown in the adversary system. Through its death penalty jurisprudence, the Supreme Court has created a system whereby juries in capital cases essentially make life and death decisions for any and all reasons. It is therefore illogical, to me, to attempt to determine the probable effect of an egregious error, like the failure to make a closing argument, because we can never know the basis for the jury's initial decision.

at all. In the context of this issue in this case, the standard of "reasonable probability" is no standard at all. I can think of no situation where we could say there is a "reasonable probability" the outcome would have differed had counsel given a closing argument or there is no "reasonable probability" that the outcome would have differed. Either way, we engage in pure conjecture. We could admit the folly of this type of review and decline to provide review in this context. But I think the better choice is to provide meaningful review and assume prejudice in situations like this one. Requiring counsel to "present whatever argument can be made to counter the state's request that [the defendant] be sentenced to death ... simply reflects a basic tenet of the adversarial process – that the defendant's interests be represented before the court." *Gerlaugh*, 129 F.3d at 1046 (Reinhardt, J. concurring in part and dissenting in part).

## Representation

Under the representation prong of *Strickland*, we must determine if the "counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Essentially, this means a complaining defendant must show "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88.

-11-

Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Argument is deemed such an important part of any trial it is afforded constitutional protection. "A defendant's right to effective assistance of counsel includes the right to present closing argument." *United States v. Stenzel*, 49 F.3d 658, 661 (10th Cir.) (citing *Herring v. New York*, 422 U.S. 853, 865 (1975)), *cert. denied*, 516 U.S. 840 (1995). This right may, however, be waived. *Id.* So the ultimate question is whether Mr. Moore's attorneys were acting within the "range of reasonable professional assistance" when they encouraged him to waive this important right.

When reviewing for ineffective assistance of counsel, courts must give wide latitude to trial lawyers in the tactics they choose to employ. *See Strickland*, 466 U.S. at 689-90. As the majority notes, the district court found "that the conscious, tactical choice of the defense in waiver of closing argument [wa]s to be accorded deferential scrutiny and that the tactic was not unreasonable." The majority agreed, finding the decision to waive closing argument to be nothing less than an informed strategic choice. There is no real question about whether the decision to waive argument in the sentencing phase of Mr. Moore's trial was in

some sense "tactical;" but, in my mind, there is also no question it was unreasonable. It was tactical to the extent Mr. Moore's attorneys considered the question and decided to waive argument in order to gain what they thought would be an advantage over the prosecution. By waiving argument, they apparently intended to prevent the prosecution from making its final closing arguments in the form of its rebuttal. This decision, and the way in which it was carried out, however, was so misdirected that it falls well outside the "wide range of reasonable professional assistance" we allow.[12]

---

[12] The majority declines to consider Mr. Moore's new claim that the use of waiver as a tactic was prompted by an initial failure by one of his attorneys to prepare a closing. I too ignore this new claim for purposes of my analysis. I do not think we have to go this far (essentially abandonment by counsel) to find ineffective assistance in this case. Forgoing a critical, constitutionally protected part of trial where the defendant's life is at stake, on the basis of a questionable interpretation of the law, in order to gain a dubious (nonexistent I would say) advantage, without taking any precautionary measures in case the plan fell through, and without, at least, making a spontaneous argument before the prosecution's rebuttal, once the judge made it clear the plan would not be successful, is far enough.

To be fair, defense counsel requested an opportunity to give an argument after the prosecution concluded its "rebuttal." However, such a last-minute attempt to correct for their error does not obviate it. Upon learning of defendant's intention to waive argument, the court held a conference in chambers to ensure the waiver was knowing and informed. During that conference, the judge indicated he would allow rebuttal if the defense waived argument. Once back in the courtroom, the judge asked the defense one last time if it intended to waive argument. At this point, although they were unprepared, counsel should have requested to argue (as they eventually did). As their "tactical" goal had failed, anything would have been better than nothing. It makes no sense to waive at this point, and then request argument later when there are no legal grounds to support the request.

Frankly, I can think of no worse decision than that made by Mr. Moore's attorneys in this case. Faced with a tough case, they decided their best course of action was to give up in the vain hope the other side would have to stop. This is closer to a complete retreat than a tactic. I agree with the Ninth Circuit that the failure to argue for "leniency 'amount[s] in every respect to no representation at all.'" *Smith v. Stewart*, 140 F.3d at 1269 (quoting *Clabourne v. Lewis*, 64 F.3d 1373, 1387 (9th Cir. 1995)) (dealing with a case in which no evidence was presented and no argument was made). Years ago a justice on the Louisiana Supreme Court found it "difficult to imagine circumstances under which a defense attorney may render effective assistance in a death penalty proceeding by waiving closing argument." *State v. Smith*, 400 So.2d 587, 595 (La. 1981) (Dennis, J., concurring). I agree, and the facts of this case do not ignite my imagination in this regard.

Furthermore, this "tactical" decision was premised on a questionable interpretation of state law that was unsuccessful in trial and on appeal. Mr. Moore was totally deprived of any opportunity to persuade the jury to spare his life, in the face of two arguments by the prosecution, because his attorneys miscalculated the effect of their decision under Oklahoma law. In my mind, the

question of whether that decision can be characterized as legitimate is completely foreclosed by their failure to prepare a closing just in case their risky tactic failed, as it ultimately did.[13] Put simply, at the time Mr. Moore's counsel made this decision, they were failing to act as "the 'counsel' guaranteed ... by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Our system allows for poor decisions by trial attorneys; it does not, however, allow for tragically wrong-headed ones.

In conclusion, I would find counsel's performance in this case to be deficient. Counsel's decision to waive argument during the sentencing phase denied Mr. Moore his day in court and denied the jury an opportunity to weigh the aggravating and mitigating circumstances on a fully informed basis. This is a breakdown in the adversary process that, I believe, renders the resulting death sentence unreliable. *See Strickland*, 466 U.S. at 687. In other words, this failure by Mr. Moore's attorneys so undermined the basic foundation underlying our trial process, I would assume it prejudiced the defense. Accordingly, I would remand this case for re-sentencing.

---

[13] It could be argued defense counsel misunderstood the legal effect, under Oklahoma law, of a defense waiver of argument on the right of the prosecution to present rebuttal (as both the trial and appellate courts ruled against counsel's position). At best, one could say counsel failed in an attempt to create a new rule.